UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOE and IRENE VALENTINE

      Plaintiff,

v.

TOWN OF CHAPEL HILL

      Defendant.

Case No. 1:22-cv-102

## SECOND AMENDED COMPLAINT

COME NOW the plaintiffs, Joe and Irene Valentine, by and through the undersigned counsel, pursuant to the Order entered by the Honorable William L. Osteen, Jr. on February 24, 2023 and file their Second Amended Complaint against the Town of Chapel Hill based upon the following:

## THE PARTIES AND JURISDICTION

1.    Petitioners Joe and Irene Valentine are natural persons and current residents of Palm Beach County in Florida.

2.    The Town of Chapel Hill is an incorporated municipality and body politic located in Orange County, North Carolina.

3.    The Town has no immunity for the constitutional claims and has purchased liability insurance or otherwise waived immunity for all claims asserted in this action.

4.    This Court has jurisdiction over this matter as most of the claims in this action arise under 42 U.S.C. § 1983, alleging the Defendant municipality denied rights secured by the U.S. Constitution and laws, constituting a federal question pursuant to 28 U.S.C. § 1331. In addition,

this Court has jurisdiction over the related state law claims because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy in accordance with 28 U.S.C. § 1367.

5.      Further, this Court has jurisdiction under N.C. Gen. Stat. § 160D-1403.1, which authorizes any person with standing to bring an original civil action in state or federal court seeking declaratory relief on the basis that a municipal ordinance is unconstitutional, ultra vires, preempted or otherwise in excess of statutory authority.

6.      Further, under N.C. Gen. Stat. § 143-318.16A(a), this Court has jurisdiction to declare null and void any action of a public body taken in violation of the Open Meetings Law.

7.      Alternatively, this Court has jurisdiction over this matter in accordance with 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000.00.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2).

## FACTS

9.      Husband and wife Joe and Irene Valentine, have continuously owned in fee simple estate since July 2004 a single family home, located at 103 New Parkside Drive, Chapel Hill, North Carolina 27516 (the "Subject Property"), which is within a lot that was created in 1999 as part of the Parkside Cluster Subdivision – Phase V community, that is zoned Residential-2 (R-2), and located off the intersection of New Parkside Drive with Martin Luther King Jr. Blvd. in Chapel Hill, North Carolina.

10.      The Valentines purchased the Subject Property on July 22, 2004 in fee simple estate by General Warranty Deed that was duly registered with the Registrar of Deeds, Orange County, NC on August 4, 2004. The Valentines lived there using it as their primary single family home till

August 2016 when they moved initially to Washington D.C. in August 2016 and from there to Florida in October 2018, where they purchased a second home, on or around April 2019, that is now their primary residence.

11. As their move out of Chapel Hill in August 2016 to Washington D.C. was not intended to be a permanent one, they attempted to lease the Subject Property to earn rental income to pay the mortgage and other expenses. However, they faced difficulties in finding tenants to lease their furnished Subject Property on a long-term basis, as most long-term tenants preferred to lease unfurnished homes.

12. The Valentines then turned to online short-term rental ("STR") platforms like AirBnB and VRBO, who advertised that STR tenants needed fully furnished homes for short stays, and explored the possibility of offering dedicated STRs through these online service providers at the Subject Property.

13. Prior to renting the Subject Property as an STR, the Valentines investigated whether whole house dedicated rentals for periods of fewer than 30 days were permitted by local law as well as by the covenants, restrictions, and rules of their home owners' association. As part of their bundle of rights in the fee simple estate ownership of the Subject Property in Chapel Hill, that is derived from constitutional, statutory and common law applicable to North Carolina, they were aware that they possessed *inter alia* the right to lease the Subject Property to tenants to derive rental income and found no restrictions on such leasing either under the Town's then existing zoning regulations or their homeowners association's covenants. They also found no distinction between short- and long- term leases in the Town's then-existing zoning regulations.

14. Numerous single family homes were and continue to be available for lease on the rental market in Chapel Hill as confirmed by a comprehensive housing market analysis of the

Durham-Chapel Hill area by the U.S. Department of Housing and Urban Development, published in June 2019, which reported that the share of single family homes in the area's rental market increased from 30% in 2010 to 33% in 2019.[1] A search on a popular real estate listing site realtor.com[2] reveals that as of this filing there are currently over 50 listings of single family homes available for rent in Chapel Hill.

15.     Accordingly, having satisfied themselves that the Town's zoning regulations as well as their HOA covenants did not bar homeowners from leasing their property, in October 2016, the Valentines began hosting short term vacation rentals at their home through two short-term rental platforms. Their first listing on Airbnb went live on October 11, 2016, they received their first booking inquiry on October 14, 2016; their first booking on October 25, 2016; and their first STR tenant arrived on November 4, 2016 for a two night stay.  During the period from October 2016 to November 2021, the Valentines hosted 68 STR stays at the Subject Property through Airbnb.

16.     The Valentines also listed their Home on HomeAway (a vacation rental marketplace now rebranded as Vacation Rentals by Owner (VRBO)) on October 31, 2016. They received their first booking enquiry through VRBO on November 1, 2016; their first booking was received on November 5, 2016; and their first STR tenant arrived on December 20, 2016 for a seven nights stay. During the period from November 2016 to November 2021, the Valentines hosted 25 STR stays at the Subject Property through VRBO.

17.     The Valentines openly listed and advertised the Subject Property on AirBnB and VRBO short term property rental sites as ideal for families and provided dedicated STRs at the Subject Property to single family tenants continuously for over five years since October 2016. The

---

[1] https://www.huduser.gov/portal/publications/pdf/Durham-ChapelHillNC-CHMA-19.pdf
[2] https://www.realtor.com/apartments/Chapel-Hill_NC/type-single-family-home

entire Subject Property was provided as a dedicated STR and almost all short term tenants were single families, due to which the Subject Property continued to be used as a single family residence in compliance with applicable zoning regulations in R-2 zone.

18.    Unlike hotels or rooming houses, no food and beverage, cleaning, housekeeping or room services were provided to STR tenant families at the Subject Property. Cleaning was done once before and once after the rental period and the families were able to use the kitchen to cook their own food. Utilities and internet services were made available for the use of the STR family tenants who paid the STR occupancy rent for the duration of their stay to the respective online platforms, AirBNB or VRBO, who deducted applicable fees and taxes at source and paid the balance amount paid by the tenant for each stay to the Valentines.

19.    Most families who stayed at the Subject Property visited Chapel Hill for a variety of reasons such as medical treatment of a family member at UNC or Duke Hospital, attending family gatherings, reunions, engagements, marriages, graduations, or to meet their children who were attending college in the area or while they were in the process of relocating to the area. These families found STRs to be more suitable than hotels due to the additional space and amenities, the homely environment that was more conducive to socializing, the availability of a kitchen to cook their own food, and the fenced backyard that was suitable for pets.

20.    Over the past five years, there have been a total of 93 such short-term rental stays at the Subject Property, of which 68 stays were through AirBNB and 25 stays through VRBO. At various times the Valentines were recognized as Superhost by AirBNB and Premier Partner by VRBO in recognition of meeting the respective platforms' hosting standards and earning very favorable reviews from short term single family tenants.

21.     The income derived from rental of the Subject Property since October 2016 exceeds $75,000.00.

22.     The Valentines continued to pay applicable property and other taxes and the Subject Property was insured for short term rental stays through Prosper Insurance. Occupancy taxes on each short-term rental was collected by the property rental platforms AirBnB and VRBO and paid to the Town on behalf of the Valentines.

23.     As the Subject Property was openly listed on public short term rental sites and occupancy and other applicable taxes paid through the STR platforms, the Town had both actual and constructive notice of the leasing of the Subject Property as a dedicated STR since October 2016. No objection was ever received from the Town for the operation of a dedicated STR at the Valentine's Subject Property since 2016 while the Town continued to receive occupancy and other taxes for over five years.

24.     Over time, the Valentines invested in upgrading their home in Chapel Hill to provide various amenities to make it more suitable for STRs. During the period from August 2016 to August 2021, the Valentines invested approximately $35,000 in amenities including a new roof, new luxury vinyl plank flooring, deck repair and painting, backyard fence repair and painting, backyard garden, HVAC, dishwasher and other appliances as well as maintaining and upgrading furniture, lighting, linen and landscaping. The Valentines hired contractors to do substantial renovations including plumbing, electrical, flooring, and general repair.

25.     The Valentines also made specific renovations for vacation rentals such as security cameras outside the home, Nest digital thermostats, new smart televisions, and a remote access lock with security codes for keyless entry for the front door.

26.    On or around May 2021, the Valentines learned that the Town was considering enacting an ordinance to ban investors from owning and operating STRs in residential zones in Chapel Hill (the "STR Ordinance"). They sent a detailed letter to the Chapel Hill Town Council on May 28, 2021, explaining that (i) they had been legally operating a dedicated STR at the Subject Property in Chapel Hill located in the R-2 residential zone for over five years since 2016; (ii) they are not a corporate investor and had owned only the Subject Property since 2004 when it was their primary home; (iii) local governments have delegated powers to regulate land use through zoning but it is impermissible for the Town to use zoning regulations to regulate the type of ownership; and (iv) the proposed ordinance would unjustifiably restrict them from exercising their property rights to earn rental income which would cause them economic damage.

27.    They also informed the Town in their letter that (i) their dedicated STR had been in operation since 2016; (ii) they had made significant investments in upgrading their property for use as an STR; (iii) there were no problems on account of STRs in Chapel Hill that warranted banning them; (iv) NC courts have repeatedly held that zoning regulations are meant to regulate land use rather than type of ownership; (v) banning STRs would be an *ultra vires* act that would directly cause them economic damage in terms of lost investment and rental income; and (vi) dedicated STRs meet a real need of traveling families for privacy, safety, security, social distancing, comfort and economy at a level that hotels are often unable to offer.

28.    The Valentines attended at least two public meetings held virtually by the Town Council wherein they made oral submissions reiterating their opposition to the proposed ordinance that would ban dedicated STRs in residential zones in Chapel Hill.

## HISTORY AND ADOPTION OF THE STR ORDINANCE

29.  Since the founding of Airbnb in August 2008, short-term rentals have become increasingly popular nationwide. Short-term rental websites such as Airbnb became popular for travelers wanting a furnished apartment or house rather than a hotel room.

30.  In or about 2019, the Town appointed a task-force, to consider regulation of short-term rentals.

31.  The initial focus of task-force discussions focused on regulation or prohibition of what were called "investor-owned" short-term rentals.

32.  The task-force used the term "investor-owned" to mean a short-term rental unit whose owner does not live on the property.

33.  A legal consultant advised the task-force that regulation based on type of owner was not legal.

34.  After receiving this advice, the task-force changed the term "investor-owner" to "dedicated."

35.  The task-force then began to use the term "dedicated" to mean a short-term rental unit whose Owner does not live on the property.

36.  After the task force concluded its work, the Town held public hearings to consider an amendment to the LUMO to, among other things, prohibit dedicated short- term rentals in certain zoning districts, including R-4.

37.  On May 18, 2021, the STR a subcommittee of the Town's Planning Commission Advisory Board submitted its opposition to the proposed ordinance. The report cited several bases, including:

    a.  That the proposed ordinance was "inconsistent with the Town's Comprehensive Plan."

b.   That the concerns expressed "appear to be primarily based on incidents in other parts of the country, not on data from Chapel Hill."

c.   That there was no evidence that short-term rentals affected property values, neigi1borhood character, or parking availability "more than student rentals."

d.   That short term rentals "[h]ave been more damaging to hotelier's profits than the addition of new hotels in recent decades."

e.   That "we do not have the data necessary to require separation of types of STRs from one another, or to relegate certain STRs to areas with particular zoning classifications.

f.   That "[i]t would be inappropriate to create " a distinction between types of STRs without data to support the policy."

g.   That regulation should be done "based on fairness and Data."

38.   The committee urged the Town to collect the data necessary to address areas of concern necessary to write a proper amendment to the LUMO.

39.   The committee also suggested that STRs should be allowed in all residential zones and that existing STRs be allowed to continue.

40.   The Town Council did not do the studies as suggested.

41.   At its meeting held on May 4, 2021, the Town's Planning Commission voted to recommend that the proposed Land Use Management Ordinance Text Amendment, regarding Short Term Rentals, was inconsistent with the Town's Comprehensive Plan. They noted that there was no evidence that STRs (i) negatively impact housing affordability or neighboring property values; (ii) are more damaging to a neighborhood's character or tranquility; (iii) affect parking availability more than student rentals; (iv) increase gun violence; or (v) have been more damaging

to hotelier's profits than the addition of new hotels in recent decades in Chapel Hill. They also noted that to date, the Town did not have the data necessary to require separation of types of STRs from one another, or to regulate certain STRs to areas with particular zoning classifications. As an Advisory Board, they recommended that STRs should be allowed in all areas zoned residential, existing operators should be granted a 'Grandfather clause' and be allowed to continue to operate.

42.  In several public meetings, Council Member Stegman suggested that any ordinance enacted should include a provision grandfathering existing STRs. No member of council or town staff objected to this recommendation in any public meeting. No additional public debate was held on the idea of grandfathering. However, no such provision was ever inserted into the draft ordinance.

43.  Upon information and belief, Town Council and planning staff determined, outside the public eye, that a grandfathering provision was not required because the staff erroneously believed that existing STR use was illegal.

44.  The Town Council disregarded these recommendations as well as opposition from numerous STR owners expressed at its virtual public meetings and unanimously voted at its June 23, 2021 meeting to enact the STR Ordinance. Among other things, the STR Ordinance banned the operation of dedicated STRs in residential zones including R-2 zone where the Valentine's Subject Property was located. To avoid having to pay compensation for such regulatory taking, the Town included an amortization clause in the ordinance which provided a grace period of 18 months during which time dedicated STR operators had to come into compliance with the ordinance.

45.  On June 23, 2021, the Town of Chapel Hill made text amendments to its Land Use Management Ordinance Sections 3.7, 4.9, 6.27, and Appendix A to ban homeowners from offering

dedicated STRs of property they own in R-LD5, RT, R-Ld1, R-1A, R-1, R-2, R-2A, R-3, R-4, R-5, and R-SS-CZD residential zones. The new ordinance went into effect immediately.

## PROVISIONS OF THE STR ORDINANCE

46. Under the STR Ordinance, existing STRs that are not a permitted use were allowed to continue operating as a short-term rental for eighteen months after the effective date of the ordinance, provided its continued operation on or after December 23, 2022, would be in violation of the LUMO.

47. The STR Ordinance defines an STR as "[a] dwelling unit rented in whole or in part for fewer than thirty (30) consecutive days for a fee or other valuable consideration …"

48. It defines a primary residence to include a dwelling unit, "in which the host resides a majority of the year (183 days per year or 50 percent or more of the time)."

49. A dedicated Short-term rental (STR) is defined as "[a] residential dwelling unit(s) located on a property not used as a primary residence in which the dwelling unit is rented in whole or in part for fewer than thirty (30) consecutive days for a fee or other valuable consideration …"

50. The amended Use Matrix in Table 3.7-1 prohibits dedicated short term rentals in R-2 residential zone.

51. The Valentines are currently residents of Florida where they maintain their primary residence. The Subject Property in Chapel Hill is currently their second home where they do not reside for a majority of the year and it would therefore not meet the definition of a primary residence under the ordinance. The Subject Property is located in the R-2 zone.

52. The Subject Property is rented in whole to single families for short stays that have generally ranged from two to ten nights with an average stay of around four to five nights. Only one out of the past 93 stays exceeded thirty (30) consecutive days.

53. Since the enactment of the Town's ordinance on June 23, 2021, making text amendments to its Land Use Management Ordinance (LUMO), the use of a non-primary residence to operate a dedicated STR is prohibited in R-2 zone. Since the Valentine's Subject Property is a non-primary residence located in R-2 zone, the amended LUMO prohibits its use as a dedicated STR from the date of its enactment on June 23, 2021, unless approved for non-conforming use or variance.

54. The ordinance also requires that a short-term rental (STR) permit shall be assigned to each residential dwelling unit that satisfies the requirements of the ordinance and is used as a primary residence STR or dedicated STR for more than fourteen (14) days per calendar year. A permit number shall be assigned to each STR, and such STR permits are required to be renewed annually before the expiration date.

55. Any person who operates a short-term rental property without a valid STR permit shall be in violation of LUMO Section 4.9.8. The penalties and remedies for violations of this ordinance are set forth in LUMO Section 4.13

56. As a result of this ordinance making text amendments to the LUMO, a property owner who was already exercising her right to legally offer STRs in R-2 and other residential zones would be prohibited from continuing to do so without a non-conforming use approval.

57. The Valentines have been operating a dedicated STR at their Home in the R-2 zone of Chapel Hill since October 2016 at which time, the LUMO did not prohibit such dedicated short term rentals in any zone.

**FIRST CLAIM FOR RELIEF**

Request for declaratory judgment

Arbitrary and Capricious Enactment

42 U.S.C. 1983

58.     The allegations in the preceding paragraphs are incorporated here as if fully set forth.

59.     Plaintiff asks that the Court declare that the STR Ordinance is not valid in that its enactment was arbitrary and capricious, as follows.

60.     The Fourteenth Amendment to the United States Constitution provides: "[N]or shall any State deprive any person of his life, liberty, or property, without due process of law."

61.     42 U.S.C. § 1983 provides "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, …"

62.     The Town had no rational basis for enacting the STR Ordinance.

63.     The STR Ordinance was a solution in search of a problem. Use of residential property for short-term rentals had not caused problems, such that there was no need for regulation.

64.     The Town's own records show a lack of problems with use of residential property for short-term rentals.

65.     The STR Ordinance does not regulate use of property on the basis of land use, but on the identity and nature of the owner, which is not regulation of land use and development.

66.     The STR Ordinance does not regulate use of property on the basis of land use, but on the length of rental, which is not regulation of land use and development.

67.     The STR Ordinance bears no relation to the Town's goals as stated in the ordinance itself.

68.     The STR Ordinance is, in fact, contrary to the staled goals:

a. Short-term rentals provide a welcoming and friendly atmosphere by providing home-like environments for visitors, and the STR Ordinance restricts such environments.

b. An intended effect of the STR Ordinance is to foster the success of certain local businesses, such as hotels and tourist homes, by banning or restricting owners of residential property from renting their property for less than an arbitrary period of time, which is not a proper purpose of municipal government.

c. The STR Ordinance inhibit one of the purposes of the Town's comprehensive plan, providing a range of neighborhood types to address various needs.

d. The STR Ordinance does not affect future land use in that it governs type of owner and length of rental rather than land use.

e. The STR Ordinance inhibits economic prosperity and social equity by denying access to income to residents wishing to rent their properties on a short-term basis without any basis in land use.

f.   The goal of protecting neighborhoods from stormwater runoff, light and noise pollution, and traffic is not relevant to short-term rentals, in that short-term rentals do not affect stormwater runoff, and they do not cause light and noise pollution or increased traffic.

g. The STR Ordinance restricts the opportunities for Chapel Hill residents to supplement their income and afford housing in the community.

h. The Town's findings on residential zoning districts, including R-4, that restricting dedicated short-term rentals will prevent the conversion into short-term rentals, maintain housing for full-time residents, reduce nuisances, and preserve neighborhood character, are based on improper zoning by type of ownership rather than land use.

i. The findings in the preceding subparagraph are also belied by the lack of history of nuisance reports from short-term rentals -whereas rentals of more than 30 days, to students and otherwise, have a long and documented history of nuisance reports.

j. On the same basis, the STR Ordinance does not help to promote the health, safety, and general welfare of the residents of the Town of Chapel Hill.

k. Otherwise to be shown at the trial of this matter.

69. The STR Ordinance ignores legitimate land-use distinctions and creates arbitrary and absurd definitions to ban some short-term rentals, restrict others, and allow other short-term rentals (such as hotels) to continue unheeded.

70. The STR Ordinance arbitrarily and capriciously and unlawfully provides for zoning based on type of owner rather than land use.

71. The STR Ordinance arbitrarily and capriciously and unlawfully provides for zoning based on length of rental.

72. The STR Ordinance arbitrarily imposes restrictions on where property owners can live in order to rent their property for less than 30 days.

73. Enactment of the of STR Ordinance was otherwise arbitrary and capricious, to be shown at the trial of this matter.

74.     But for the enactment of the ordinance, Plaintiffs' continued operation of the property as a STR would not be at risk, nor would Plaintiffs' income stream from the STR use of the property.

75.     Plaintiffs have been arbitrarily denied the use of their property as a short term rental without due process as the ordinance fails to further any government interest and arbitrarily limits the rights of homeowners, in violation of 42 U.S.C. 1983.

## SECOND CLAIM FOR RELIEF

Declaratory Judgment

Denial of due process

Article I, Section 19 of the North Carolina Constitution and N.C. Gen. Stat. § 160D-1403.1

76.     The allegations in the preceding paragraphs are incorporated here as if fully set forth.

77.     Plaintiffs ask that the Court declare the STR Ordinance not valid on the basis that it is a violation of Plaintiffs' state constitutional right to due process.

78.     The North Carolina State Constitution, Article l, § 19 (the "Law of the Land" clause), provides: "No person shall be ... deprived of his life', liberty or property, but by the law of the land."

79.     This provision has been interpreted to provide due process protections against the arbitrary action of government, including the exercise of power without reasonable justification in the service of a legitimate government objective.

80.     N.C. Gen. Stat. § 160D-1403.1 authorizes any person with standing to bring an original civil action in state or federal court seeking declaratory relief on the basis that a municipal ordinance is unconstitutional, ultra vires, preempted or otherwise in excess of statutory authority.

81.     Zoning regulations promulgated under the police powers of a municipality restrict the use of private property to promote the public health, the public safety,  the public morals,, or the public welfare. However, a municipality cannot, under the guise of protecting the public, arbitrarily interfere with the use of private property or prohibit lawful occupations or impose unreasonable and unnecessary restrictions on them.

82.     Zoning and similar regulations are subject to the limitations on legislative power forbidding arbitrary and unduly discriminatory interference with the rights of property owners.

83.     Short-term rentals in the Town of Chapel Hill have posed no peculiar danger to the public health, safety, morals, or welfare, as opposed to any other property use, including hotels.

84.     The STR Ordinance is an arbitrary and unduly discriminatory interference with the rights of property owners, including Plaintiffs.

85.     The Town has arbitrarily interfered with use of private property, rental of residential units in residential zones for less than an arbitrary number of days.

86.     The Town has prohibited some rentals of renting residences for less than an arbitrary number of days and posed unreasonable and unnecessary restrictions on other such rentals.

87.     The Town, under the guise of protecting the public, arbitrarily interfered with Plow's use of his property for short-term rentals, and either prohibited lawful short-term rentals or imposed unreasonable and unnecessary restrictions on them.

88. The only danger posed by short-term rentals was to the desire of some businesses in the Town to avoid competition from residential short-term rentals and the willingness of the Town to bow to pressure from such businesses.

89. But for the enactment of the ordinance, Plaintiffs' continued operation of the property as a STR would not be at risk, nor would Plaintiffs' income stream from the STR use of the property.

90. Plaintiffs have been arbitrarily denied the use of their property as a short term rental without due process as the ordinance fails to further any government interest and arbitrarily limits the rights of homeowners.

**THIRD CLAIM FOR RELIEF**

Declaratory Judgment

Denial of equal protection of law

Article I, Section 19 of the North Carolina Constitution and N.C. Gen. Stat. § 160D-1403.1

91. The allegations in the preceding paragraphs are incorporated here as if fully set forth.

92. Article I, Section 19, of the North Carolina State Constitution provides: "No person shall be denied the equal protection of the laws."

93. N.C. Gen. Stat. § 160D-1403.1 authorizes any person with standing to bring an original civil action in state or federal court seeking declaratory relief on the basis that a municipal ordinance is unconstitutional, ultra vires, preempted or otherwise in excess of statutory authority.

94. Enactment of the STR Ordinance was an intentional and purposeful decision by the Town.

95.     In enacting the STR Ordinance, the Town has treated Plaintiffs differently from other similarly situated property owners:

  i.  As to the distinction between "dedicated short-term rentals" and "primary residence short-term rentals," on the basis that they do not live in the Subject Property.

  ii. As to the regulation of rentals by length of rentals, on the basis of length of rental.

  iii. By definitions added to the LUMO in the STR Ordinance that create artificial distinctions with no rational relationship with any legitimate government interest, or any basis in reality, between land uses that are continued to be allowed and Plaintiffs' use of the Subject Property for short-term rentals.

  iv. By denying them the right to use their property in accordance with the zoning district in which the Subject Property is located, when other uses that are substantially similar or the same as short-term rentals are allowed to continue in that district.

  v.  By continuing to allow short-term rentals in R-4 and other residential zoning districts by simply adding a phrase to the definition of "tourist home" to provide that tourist homes, which are engaged in short-term rentals and are similarly situated to the Subject Property, are not short-term rentals covered by the STR Ordinance.

  vi. Otherwise to be shown at the trial of this matter.

96. There is no rational relationship between the STR Ordinance and any legitimate government purpose.

97. The Town's own records and studies fail to show any legitimate problem to be solved by the STR Ordinance.

98. In enacting the STR Ordinance, the Town has denied Plaintiffs the equal protection of law by discriminating against homeowners who do not live at a property.

99. Plaintiffs ask the Court to declare that the STR Ordinance is not valid pursuant to the Article I, § 19, of the North Carolina State Constitution.

100. But for the enactment of the ordinance, Plaintiffs' continued operation of the property as a STR would not be at risk, nor would Plaintiffs' income stream from the STR use of the property.

101. Plaintiffs have been arbitrarily denied the use of their property as a short term rental and do not benefit from equal protection of the law, when compared to property owners who live at their property and provide STRs.

**FOURTH CLAIM FOR RELIEF**

Declaratory Judgment

Denial of equal protection of law

42 U.S.C. 1983

102. The allegations in the preceding paragraphs are incorporated here as if fully set forth.

103. U.S. Const. Amend. XIV provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws.

104. 42 U.S.C. § 1983 provides "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity, or other proper proceeding for redress, …"

105.  Enactment of the STR Ordinance was an intentional and purposeful decision by the

Town.

106.  In enacting the STR Ordinance, the Town has treated Plaintiffs differently from

other similarly situated property owners:

      i.   As to the distinction between "dedicated short-term rentals" and "primary residence short-term rentals," on the basis that they do not live in the Subject Property.

     ii.   As to the regulation of rentals by length of rentals, on the basis of length of rental.

   iii.   By definitions added to the LUMO in the STR Ordinance that create artificial distinctions with no rational relationship with any legitimate government interest, or any basis in reality, between land uses that are continued to be allowed and Plaintiffs' use of the Subject Property for short-term rentals.

    iv.   By denying them the right to use their property in accordance with the zoning district in which the Subject Property is located, when other uses that are substantially similar or the same as short-term rentals are allowed to continue in that district.

     v.   By continuing to allow short-term rentals in R-4 and other residential zoning districts by simply adding a phrase to the definition of "tourist home"

to provide that tourist homes, which are engaged in short-term rentals and are similarly situated to the Subject Property, are not short-term rentals covered by the STR Ordinance.

    vi.  Otherwise to be shown at the trial of this matter.

107.  There is no rational relationship between the STR Ordinance and any legitimate government purpose.

108.  The Town's own records and studies fail to show any legitimate problem to be solved by the STR Ordinance.

109.  In enacting the STR Ordinance, the Town has denied Plaintiffs the equal protection of law by discriminating against homeowners who do not live at a property.

110.  Plaintiffs ask the Court to declare that the STR Ordinance is not valid pursuant to the 42 U.S.C. 1983 and U.S. Const. Amend XIV.

111.  But for the enactment of the ordinance, Plaintiffs' continued operation of the property as a STR would not be at risk, nor would Plaintiffs' income stream from the STR use of the property.

112.  Plaintiffs have been arbitrarily denied the use of their property as a short term rental and do not benefit from equal protection of the law, when compared to property owners who live at their property and provide STRs.

## FIFTH CLAIM FOR RELIEF
Request for declaratory judgment

Denial of Vested Rights

Article I, Section 19 of the North Carolina Constitution and N.C. Gen. Stat. § 160D-1403.1

113.  The allegations in the preceding paragraphs are incorporated here as if fully set forth.

114.  Plaintiffs ask that the Court declare that the STR ordinance is not valid in that it denies Plaintiffs' vested rights as follows.

115.  Article I, Section 19, of the North Carolina State Constitution (the "Law of the Land" clause) protects Plaintiffs' right to procedural and substantive due process and prohibits municipalities from retroactively depriving a person of a vested property right.

116.  N.C. Gen. Stat. § 160D-1403.1 authorizes any person with standing to bring an original civil action in state or federal court seeking declaratory relief on the basis that a municipal ordinance is unconstitutional, ultra vires, preempted or otherwise in excess of statutory authority.

117.  Plaintiffs have a vested right in use of their property for short-term rentals, in that:

    a.    Plaintiffs use of the Subject Property for short-term rentals long predates the enactment of the STR Ordinance.

    b.    Plaintiffs have made substantial expenditures including maintaining the property specifically for short-term rentals.

    c.    The expenditures were made in good faith reliance on short-term rentals being a lawful use of their property at all times.

118.  As the North Carolina Court of Appeals recently reaffirmed in *Frazier v. Town of Blowing Rock*, 882 S.E.2d 91, 96 (2022): "Our jurisprudence is clear that in the event of doubts or ambiguity, zoning regulations are to be construed in favor of the free use of property." Prior to enactment of the STR Ordinance, no law unambiguously forbid Plaintiffs' use of their property for short-term rentals.

119.  If the Town is allowed to deny Plaintiffs the right to use their property for short-term rentals, this will result in a detriment to Plaintiffs, including loss of property value and investment.

## SIXTH CLAIM FOR RELIEF

### Request for declaratory judgment

### Ultra Vires

### Article I, Section 19 of the North Carolina Constitution and N.C. Gen. Stat. § 160D-1403.1

120.  The allegations in the preceding paragraphs are incorporated here as if fully set forth.

121.  N.C. Gen. Stat. § 160D-1403.1, which authorizes any person with standing to bring an original civil action in state or federal court seeking declaratory relief on the basis that a municipal ordinance is unconstitutional, ultra vires, preempted or otherwise in excess of statutory authority.

122.  The Town's authority to enact the STR Ordinance, the LUMO, and all other zoning and land use regulation is based in Chapter 160D of the North Carolina General Statutes, which by its plain language provides authority for "development regulations" and provides that the chapter also applies to "any other local ordinance that substantially affects land use and development."

123.  As the North Carolina Supreme Court has stated: "A municipality has no inherent power to zone its territory and possesses only such power to zone as is delegated to it by the enabling statutes. The authority to enact zoning ordinances is subject to the limitations imposed by the enabling statute and by the Constitution. These limitations forbid arbitrary and unduly discriminatory interference with property rights in the exercise of such power. Thus, a zoning ordinance or an amendment thereto which is not adopted in accordance with the enabling statutes is invalid and ineffective." *Heaton v. City of Charlotte*, 277 N.C. 506, 513, 178 S.E.2d 352, 356–57 (1971).

124. Pursuant to N.C.G.S. § 160D-702, "a zoning regulation may regulate and restrict the height, number of stories, and size of buildings and other structures; the percentage of lots that may be occupied; the size of yards, courts, and other open spaces; the density of population; the location and use of buildings, structures and land." Provisions for rights-of-way and recreation space and facilities are allowed.

125. No authority is granted for zoning regulations to specify the type of owner or the length of rental. The North Carolina Court of Appeals in *City of Wilmington v. Hill*, 189 N.C. App. 173 (2008) held: "If a use is permitted, as here, it is beyond the power of the municipality to regulate the manner of ownership of the legal estate." In other words, once the city has decided to allow short-term rentals in residential districts, it cannot constitutionally require the property to be owner-occupied or discriminate between owner-occupied and non-owner-occupied rentals.

126. In another case, the North Carolina Court of Appeals put it this way: "zoning is not the regulation of ownership of land or the structures thereon. Rather, zoning only deals with regulation of what occurs on real property." *Clegg v. City of Durham*, No. COA06-700 (N.C. App., 2007). There is no statutory authority for an ordinance that regulates the occupancy of property.

127. The Town did not have authority to enact the STR Ordinance.

128. Article I, Section 19, of the North Carolina State Constitution (the "Law of the Land" clause) protects Plaintiffs' right to procedural and substantive due process and prohibits municipalities from exceeding their designated authority.

129. N.C. Gen. Stat. § 160D-1403.1 authorizes any person with standing to bring an original civil action in state or federal court seeking declaratory relief on the basis that a municipal ordinance is unconstitutional, ultra vires, preempted or otherwise in excess of statutory authority.

**SEVENTH CLAIM FOR RELIEF**

Request for declaratory judgment

Open Meetings

N.C. Gen. Stat. § 143-318.16A(a)

130. The allegations in the preceding paragraphs are incorporated here as if fully set forth.

131. The STR Ordinance is invalid because the decision not to grandfather existing uses was made outside an open meeting in violation of North Carolina law.

132. Chapter 143, Article 33C of the North Carolina General Statutes, the Open Meetings Law, requires that hearings, deliberations and actions of public bodies be conducted openly and with notice.

133. In several public meetings, Council Member Stegman suggested that any ordinance enacted should include a provision grandfathering existing STRs.

134. No member of council or town staff objected to this recommendation in any public meeting. No additional public debate was held on the idea of grandfathering.

135. Ultimately, no such grandfathering provision was ever inserted into the draft ordinance.

136. Under the circumstances, the Court can reasonably infer that the decision not to grandfather existing uses was made outside the public eye in violation of the Open Meetings Law.

137. Under N.C. Gen. Stat. § 143-318.16A(a), this Court has the authority to declare null and void any action of a public body taken in violation of the Open Meetings Law.

**EIGHTH CLAIM FOR RELIEF**

Request for declaratory judgment

Dormant Commerce Clause

42 U.S.C. 1983

138. The allegations in the preceding paragraphs are incorporated here as if fully set forth.

139. The requirement in the STR Ordinance that owners reside in their property in order to use that property for short-term rentals is a violation of the United States Constitution Article I, Section 8, Clause 3, generally known as the Commerce Clause.

140. 42 U.S.C. § 1983 provides "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, …"

141. The Commerce Clause gives Congress the power "[t]o regulate Commerce ... among the several States." Although this is phrased as an affirmative power, the courts have long recognized "that it also limits the power of the States to erect barriers against interstate trade." *Dennis v. Higgins*, 498 U.S. 439, 446, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980)).

142. This passive or negative aspect of the Commerce Clause (or Dormant Commerce Clause) prevents states (or their subdivisions such as cities) from discriminating against out-of-state interests. In this context, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). "[W]hen a state statute discriminates against interstate commerce, it will be struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Yamaha Motor Corp. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir.2005)

(quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992)). There is no question that leasing of real estate can be interstate commerce. *See, e.g.,* 15 U.S.C. §1703 (forbidding certain sales or leases of real property in interstate commerce).

143.    An ordinance that establishes unfavorable treatment for short-term rentals in which the owner does not live on-site has the effect of discriminating against out-of-state owners of real property. While a local owner may or may not prefer to reside on-site while engaging in short-term leasing of his property, he is able to make that choice. However, it is simply not possible for an out-of-state owner such as Plaintiffs to reside on the property.

144.    Such discrimination requires some justification that would protect it from the operation of the Dormant Commerce Clause. Here, the Town has failed to provide any justification sufficient to overcome the presumption of discrimination against out-of-state interests.

145.    The Fifth Circuit Court of Appeals recently addressed a similar ordinance requiring residency in order to operate a short-term rental in *Hignell-Stark v. City of New Orleans,* 46 F.4th 317 (2022).

146.    The *Hignell-Stark* Court held: "The residency requirement discriminates on its face against out-of-state property owners. The City doesn't just make it more difficult for them to compete in the market for STRs in residential neighborhoods; it forbids them from participating altogether." *Id.* at 326.

147.    Because the ordinance was facially discriminatory, the *Hignell-Stark* Court went on to state that it was virtually *per se* invalid and could only be upheld if there were no "reasonable alternatives that the City could adopt". *Id*. at 327. Because there were other options that New Orleans could have followed to achieve the same objectives, the *Hignell-Stark* Court found the residency requirement to be unconstitutional.

148.    Although not binding on this Court, *Hignell-Stark* should be accorded substantial weight because it deals in depth with an ordinance nearly identical to the one at issue here.

**NINTH CLAIM FOR RELIEF**

Request for Declaratory Judgment

Freedom of Movement

42 U.S.C. 1983

149.    The allegations in the preceding paragraphs are incorporated here as if fully set forth.

150.    The STR Ordinance is invalid because it violates the freedom of movement between states guaranteed by the United States Constitution.

151.    42 U.S.C. § 1983 provides "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, …"

152.    Freedom of movement under United States law is governed primarily by the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution which states, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Since the ruling in *Corfield v. Coryell*, 6 Fed. Cas. 546 (1823), freedom of movement has been judicially recognized as a fundamental Constitutional right.

153.    In *Paul v. Virginia*, 75 U.S. 168 (1869), the court defined freedom of movement as "right of free ingress into other States, and egress from them." Under the "privileges and immunities" clause, the authority to protect freedom of movement was given to the states, a

position the court held consistently through the years in cases such as *Ward v. Maryland*, 79 U.S. 418 (1871), *the Slaughter-House Cases,* 83 U.S. 36 (1873) and *United States v. Harris*, 106 U.S. 629 (1883).

154. The U.S. Supreme Court in *Crandall v. Nevada*, 73 U.S. 35 (1868) declared that freedom of movement is a fundamental right and therefore a state cannot inhibit people from leaving the state by taxing them.

155. The U.S. Supreme Court also dealt with the right to travel in the case of *Saenz v. Roe*, 526 U.S. 489 (1999) holding that the United States Constitution protected three separate aspects of the right to travel among the states:

    i. the right to enter one state and leave another (an inherent right with historical support from the Articles of Confederation),

    ii. the right to be treated as a welcome visitor rather than a hostile stranger (protected by the "Privileges and Immunities" clause in Article IV, § 2), and

    iii. (for those who become permanent residents of a state) the right to be treated equally to native-born citizens (this is protected by the 14th Amendment's Privileges or Immunities Clause; citing the majority opinion in the *Slaughter-House Cases*, Justice Stevens said, "the Privileges or Immunities Clause of the Fourteenth Amendment ... has always been common ground that this Clause protects the third component of the right to travel.").

156. The court's establishment of a strong constitutional right to freedom of movement has had far-reaching effects. For example, the Supreme Court overturned state prohibitions on welfare payments to individuals who had not resided within the jurisdiction for at least one year as an impermissible burden on the right to travel (*Shapiro v. Thompson*, 394 U.S. 618 (1969)). The

court has also struck down one-year residency requirements for voting in state elections (*Dunn v. Blumstein*, 405 U.S. 330 (1972)), one-year waiting periods before receiving state-provided medical care (*Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974)), civil service preferences for state veterans (*Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898 (1986)).

157. Here, the STR Ordinance defines a primary residence as "a dwelling unit…, in which the host resides a majority of the year (183 days per year or 50 percent or more of the time)." It also defines a dedicated Short-term rental (STR) as "a residential dwelling unit(s) located on a property not used as a primary residence in which the dwelling unit is rented in whole or in part for fewer than thirty (30) consecutive days for a fee or other valuable consideration …"

158. Dedicated short term rentals are prohibited in R2 and other zones; primary residence short term rentals are not so prohibited. Therefore, to be eligible to operate a short-term rental in the R2 zone, the homeowner must utilize his home as his primary residence for which he is required to live in his home in the Town for a majority of the year (183 days per year or 50 percent or more of the time.) This regulation punishes property owners for moving out of state, and therefore violates the fundamental constitutional right of movement and right to travel.

159. The standard of judicial review for violations of the right to travel is strict scrutiny. *See, e.g. Dunn v. Blumstein*, 405 U.S. 330, 342 (1972): ("[D]urational residence laws must be measured by a strict equal protection test: they are unconstitutional unless the State can demonstrate that such laws are 'necessary to promote a compelling governmental interest.' . . . It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision.'")

160. "Strict scrutiny applies when a regulation classifies persons on the basis of certain designated suspect characteristics or when it infringes on the ability of some persons to exercise a fundamental right." *Department of Transportation v. Rowe*, 549 S.E.2d 203, 353 N.C. 671 (2001).

161. The Town has not provided any evidence that the STR Ordinance advances a compelling government interest. The records available with the Town show that nuisance complaints received by the Town are almost entirely related to long term student housing. The Town has not received any significant number of complaints of such nuisance related to short term rentals. Further, the Town has not commissioned any study to evaluate the impact of short term rental housing on neighborhoods and the local economy.

162. At its meeting held on May 4, 2021, the Town's Planning Commission voted the proposed Land Use Management Ordinance Text Amendment, regarding Short Term Rentals (STRs), as inconsistent with the Town's Comprehensive Plan. They noted that there was no evidence that STRs (i) negatively impact housing affordability or neighboring property values; (ii) are more damaging to a neighborhood's character or tranquility; (iii) affect parking availability more than student rentals; (iv) increase gun violence; or (v) have been more damaging to hotelier's profits than the addition of new hotels in recent decades in Chapel Hill. They also noted that to date, the Town did not have the data necessary to require separation of types of STRs from one another, or to regulate certain STRs to areas with particular zoning classifications. As an Advisory Board, they recommended that STRs should be allowed in all areas zoned residential, existing operators should be granted a 'Grandfather clause' and be allowed to continue to operate.

163. In view of the clear and unanimous recommendation of the Town's Planning Commission, the lack of evidence with the Town to support the claim that short-term rental tenants cause any type of nuisance, and the availability of records with the Town which show that long

term student housing in the Town is the source of most, if not all, complaints from neighbors, the Town has failed to establish that its ordinance bears "advances a compelling government interest."

164. The STR Ordinance the Privileges and Immunities Clause of the United States Constitution by prohibiting freedom of movement and travel, fails to pass the strict scrutiny test and must be struck down as unconstitutional.

WHEREFORE, Plaintiffs pray the Court:

1. For a declaratory judgment that the STR Ordinance is not valid.

2. For attorney fees as allowed by law.

3. Tax the costs of this action against the Town including attorney's fees in accordance with the terms of N.C. Gen. Stat. § 6-21.7; and

4. For such other and further relief as the Court may deem just and proper.